# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WENDY GRAHAM, MARIA HÖHN, MIA MASK, CINDY SCHWARZ, AND DEBRA ZEIFMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VASSAR COLLEGE,<br><br>Defendant. | No. 23-cv-7692<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Wendy Graham, Maria Höhn, Mia Mask, Cindy Schwarz, and Debra Zeifman, individually and on behalf of all others similarly situated, allege upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## NATURE OF THE CLAIM

1.      Plaintiffs are female current or former faculty of Defendant Vassar College, who each achieved the rank of full professor.  Plaintiffs allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the New York State Equal Pay Law ("NY EPL"), Labor Law § 194, and the New York State Human Rights Law ("NY HRL"), Executive Law §§ 296-301, on behalf of themselves and all other similarly situated women currently or formerly employed by Vassar as full professors between May 14, 2015 through the resolution of this action.

2.      Vassar is a private liberal arts college in Poughkeepsie, New York, and was the second degree-granting institution of higher education for women in the United States.  The College was founded in 1861 "to provide women an education equal to that once available only

to men."[1]  In 1926, Vassar joined "The Seven Sisters," a consortium of women's colleges that also includes Barnard, Bryn Mawr, Mount Holyoke, Smith, Radcliffe, and Wellesley.[2]  The Seven Sisters formed "to combat the crisis which the women's colleges [were] facing, namely, the difficulties women's schools were having in raising endowment money sufficient for the desired caliber of education for these early 20th century young women."[3]  Vassar still proudly identifies as a "pioneer for women's education," and asserts that the "unique traditions upon which the college was founded continue to be upheld today," including "a commitment to the advancement of equality between the sexes."[4]

3.      Despite publicly claiming a storied role in the movement for gender equality, Vassar has long and privately been underpaying its female professors.  Average salary data shared with *The Chronicle of Higher Education* reflect a gender pay disparity for full professors at Vassar in every year for the last two decades.  Most troublingly, these data reflect a widening of the gender pay gap at Vassar over time:  the disparity was 7.6 percent (its smallest) in the 2003-2004 academic year; grew to as high as 13.4 percent in the 2010-2011 academic year; and remained at 10.0 percent in the 2021-2022 academic year (the last year of available data).  Indeed, Vassar underpays its female full professors *to this day*.  Because Vassar requested (over Plaintiffs' objection) that Plaintiffs publicly name the men whom Vassar has paid more than them, Plaintiffs amended their complaint to do so.  As set forth below, Vassar has unlawfully paid numerous male professors more than each of the Plaintiffs for substantially similar work, including (in many cases) men who joined Vassar long after the Plaintiffs.  But make no mistake:

---

[1] Vassar College, *About*, https://www.vassar.edu/about.

[2] Vassar College, *The Founding of The Seven Sisters*, https://vcencyclopedia.vassar.edu/notable-events/the-seven-sisters/.

[3] *Id*.

[4] Vassar College, *A History of Vassar College*, https://www.vassar.edu/about/history.

Vassar's discriminatory underpayment of women extends far beyond the five Plaintiffs here or the dozens of men Vassar has paid more than them.

4.      Vassar has also long and privately been sweeping complaints of discrimination under the rug.  Since at least as early as 2003, and consistently since then, female professors have internally elevated concerns to the Vassar administration about unequal pay within the College's ranks.  Instead of remedying its gender pay gap, Vassar responded by *decreasing* the level of transparency about faculty salaries, in an apparent attempt to mask its decades-long pattern of underpaying of women.  In so doing, Vassar stands in stark contrast to the many employers—including within academia—to have heeded the nationwide call to *increase* pay transparency.  Vassar's turn toward opacity would be problematic for any institution, let alone one that so publicly claims to strive for equity and inclusion.  The College's attempt to cover-up—rather than correct—its underpayment of women also amounts to intentional discrimination.

5.      For years, Vassar has also implemented personnel policies that the College knows disadvantage women.  Vassar systematically delays the promotion of female professors, causing women to advance more slowly through faculty ranks at the College.  The College's performance evaluation system, too, is marred by discrimination.  Vassar's College-wide compensation, promotion, and evaluation policies, while facially neutral, have therefore had a disparate impact on women.  Vassar's maintenance of these policies—despite the College's knowledge that they disparately impact women—amounts to intentional discrimination.  These policies must be reformed, to ensure fairness and gender equity moving forward.

6.      Plaintiffs—and all Vassar female full professors—are leaders in their fields who are highly regarded by their contemporaries and the student population.  For far too long, Vassar has failed to fairly and equitably value their contributions to the College.  Through this action,

Plaintiffs seek to achieve what they were prevented from accomplishing through private internal channels: gender equity for themselves and other female full faculty, and the adoption of fair processes to ensure that future generations of faculty are paid, promoted, and evaluated fairly.

## PARTIES

### I.  Plaintiffs

7.  Plaintiff Wendy Graham is a woman who is employed by Vassar College as a full Professor in the English Department.

8.  Plaintiff Maria Höhn is a woman who was employed by Vassar College as a full Professor in the History Department.

9.  Plaintiff Mia Mask is a woman who is employed by Vassar College as a full Professor in the Film Department.

10.  Plaintiff Cindy Schwarz (Rachmilowitz) is a woman who is employed by Vassar College as a full Professor in the Physics and Astronomy Department.

11.  Plaintiff Debra Zeifman is a woman who is employed by Vassar College as a full Professor in the Psychological Science Department.

12.  At all relevant times, Plaintiffs have been covered employees within the meaning of all applicable statutes.

### II.  Defendant

13.  Defendant Vassar College is a private institution of higher education located in Poughkeepsie, New York and chartered in the State of New York.[5]

14.  Upon information and belief, Vassar maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

---

[5] Vassar College, *The Governance of Vassar College*, https://offices.vassar.edu/dean-of-the-faculty/wp-content/uploads/sites/36/2021/08/governance-2021-22.pdf.

15.     At all relevant times, Vassar was Plaintiffs' employer within the meaning of all applicable statutes.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 2000e–5(f)(3) because this case includes claims arising under federal law that are brought to recover damages for deprivation of equal rights.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This Court has personal jurisdiction over Vassar because Vassar is incorporated and resides in this District, regularly transacts business in this District, and committed acts within this District that caused injury to persons and/or property within the District.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because Vassar is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## ALLEGATIONS

19.     Though female full professors employed by Vassar perform comparable work to that of male full professors and provide other comparable services to the College, Vassar has consistently—and for decades—failed to treat them equitably with respect to compensation, promotions, and evaluations.

20.     Vassar systematically underpays, underpromotes, and unfairly evaluates its female full professors, in violation of Title VII, New York law, and the College's stated commitments to equity.  Vassar's college-wide policies and practices regarding compensating, promoting, and evaluating its faculty, while facially neutral, have had and continue to have a disparate impact on women.  By continuing to use these policies—despite knowledge of their disparate impact—Vassar also intentionally discriminates against its female faculty.

21.     Plaintiffs each filed a charge of gender discrimination with the Equal

Employment Opportunity Commission ("EEOC"), individually and on behalf of all similarly

situated female full professors currently or formerly employed by Vassar College between May

14, 2015 through the present.  By notices dated September 29, 2023, the EEOC issued each

Plaintiff a Notice of Right to Sue.

**I.     Vassar Knowingly and Systematically Underpays Female Professors**

22.     Upon information and belief, and as reflected in both public and internal

reporting, Vassar's female full professors are paid less, on average, than their similarly situated

male peers for performing substantially similar work.

23.     Pay disparities within this Class often began at hire, as Vassar systematically

offered men higher starting salaries than women.  Because pay increases are a percentage of

prior salary at Vassar, that initial disparity grows exponentially over Class members' (often

multi-decade) careers.  As a result, a relatively lower (than men's) starting salary in the early

years—which has been the reality for women at Vassar dating back decades—renders women's

salaries disadvantaged to an increasing extent over the course of their careers.

24.     Indeed, data Vassar shared with *The Chronicle of Higher Education* show not

only a gender pay gap in average salary for full professors in *every year* dating back to 2003, but

also reflect that this gap has *grown over time*:

| Year | Male | Female | Pay Gap ($) | Pay Gap (%) |
|---|---|---|---|---|
| 2003-2004 | $108,125 | $100,462 | $7,663 | 7.6% |
| 2004-2005 | $112,648 | $103,327 | $9,321 | 9.0% |
| 2005-2006 | $116,813 | $107,455 | $9,358 | 8.7% |
| 2006-2007 | $120,352 | $108,207 | $12,145 | 11.2% |
| 2007-2008 | $125,721 | $112,974 | $12,747 | 11.3% |
| 2008-2009 | $132,293 | $118,047 | $14,246 | 12.1% |
| 2009-2010 | $126,414 | $113,831 | $12,583 | 11.1% |
| 2010-2011 | $127,607 | $112,555 | $15,052 | 13.4% |

-6-

| Year | Male | Female | Pay Gap ($) | Pay Gap (%) |
|------|------|--------|-------------|-------------|
| 2011-2012 | $130,558 | $118,211 | $12,347 | 10.4% |
| 2012-2013 | $133,938 | $122,526 | $11,412 | 9.3% |
| 2013-2014 | $137,340 | $122,967 | $14,373 | 11.7% |
| 2014-2015 | $137,115 | $124,479 | $12,636 | 10.2% |
| 2015-2016 | $140,040 | $125,820 | $14,220 | 11.3% |
| 2016-2017 | $141,399 | $128,808 | $12,591 | 9.8% |
| 2017-2018 | $142,089 | $131,126 | $10,963 | 8.4% |
| 2018-2019 | $146,109 | $132,676 | $13,433 | 10.1% |
| 2019-2020 | $155,223 | $135,435 | $19,788 | 14.6% |
| 2020-2021 | $148,442 | $133,247 | $15,195 | 11.4% |
| 2021-2022 | $153,238 | $139,322 | $13,916 | 10.0% |

25. There is no doubt that Vassar has long known about—and long failed to correct—this pay disparity. For example, on the initiative of then Director of Women's Studies, Professor Lydia Murdoch, then-Dean of Faculty Jon Chenette agreed to host a retreat on May 6, 2011, at which the College put on a presentation entitled, "Women in the Academy: A Snapshot of Indicators of the State of Women Faculty at Vassar." The presentation included the following table comparing average salary data, by gender, for Vassar's full faculty for the 2009-2010 academic year:

### Full Time Faculty - Average Salary Data by Gender

Source: AAUP/HEDS Faculty Compensation Survey, Fall 2009-10

(Data in thousands of dollars)

| | *Men* | | | | *Women* | | |
|---|---|---|---|---|---|---|---|
| *Professor* | *Associate* | *Assistant* | | *Professor* | *Associate* | *Assistant* |
| 126.4 | 91.2 | 68.5 | | 113.8 | 87.1 | 69.0 |

26. As this chart demonstrates, the Vassar administration has long been aware of—and even internally commented on—the same pay gaps for female full professors that were reported out to *The Chronicle of Higher Education*.

-7-

27.     Vassar has also long known that women professors are less satisfied than men with their compensation, experience this pay disparity as discrimination, and doubt Vassar's commitment to gender equity.  In a 2011 self-reported survey of the Vassar faculty that was shared at the same May 2011 retreat:

        a.     of respondents who answered that they were "Not Satisfied" with salary, 62.5% were women while only 37.5% were men;

        b.     of respondents who answered "disagree strongly" to the prompt, "women faculty are treated fairly here," 80% were women, while only 20% were men;

        c.     42.4% of women reported experiencing discrimination at Vassar, with 11.9% of women reporting that this discrimination was "extensive"; and

        d.     17.2% of women responded that "institutional priority to promote gender equity among faculty" was a "low priority" for Vassar.

28.     For many years, female faculty have attempted to work collaboratively with Vassar to address these concerns and close the gender pay gap.  For example, the steering committee of this 2011 retreat recommended, among other things: (i) publication of faculty salary ranges and merit increases by rank (as had been previous practice); (ii) establishment of clearer guidelines for evaluation of performance; (iii) creation of an independent, faculty advocacy board to facilitate faculty negotiations regarding salary and service expectations; and (iv) increased transparency in all matters concerning the institution.  At this juncture, and at every turn since, Vassar has refused to correct its legacy of underpaying female faculty.

29.     In or around 2013, a group of women professors again approached the administration—seeking an audience with then-President Catharine "Cappy" Bond Hill—in the hopes of redressing the inequity apparent in the *Chronicle* data.  Though the administration

acknowledged the existence of the disparity in the publicly reported data, it refused to cooperate with their attempt to close the pay gap. In an email dated September 30, 2013, then-Acting Dean of Faculty Stephen Rock wrote: "I am sorry to say that the raw data will not be released." Though Vassar had already disclosed the requested data to a male member of the faculty, Dean Rock explained it was because this man was a "world-class econometrician." Among the *women* faculty with whom Dean Rock refused to share the raw data were: a world-class economist, a world-class physicist, a world-class psychologist, a world-class biologist, and two world-class historians.

30.     By 2020, little to nothing had changed. In the fall of that academic year, another group of female full professors gathered publicly available data, including the *Chronicle* data, and engaged then- and current-President Elizabeth Bradley and then- and current-Dean of Faculty William Hoynes in the hopes of finally resolving the pay disparity.

31.     Their efforts at first seemed to gain traction: Vassar agreed to conduct a pay equity study analyzing compensation for the 2020-2021 academic year. President Bradley, Biniam Tesfamariam of Vassar's Office of Institutional Research, and this group of women then spent three months—October through December of 2020—analyzing data provided by the College, which confirmed that pay disparities at the full professor level (as publicly reported) had persisted over the years. The pay gap was most pronounced among the longest-serving women: the gender difference in median annual salary among full professors serving twenty or more years post-tenure was roughly $30,000, amounting to a 20 percent pay gap every year for many in this distinguished group of female professors.

32.     Unfortunately, Vassar's cooperation largely ended with its confirmation that the gender pay gap had not been addressed. On February 1, 2021, Dean Hoynes wrote to a number

of the women engaged in the internal efforts and informed them that, based on Vassar's recent analysis of faculty salaries, he would be working with the administration to conduct equity reviews for *some* (but not all) professors.  Despite the clear pattern of widespread discrimination revealed by the pay equity study, review was not automatic:  any professor who wanted a review had to request one, and some who requested a review did not receive one.  Of those professors whose salaries were reviewed, many were not given a pay adjustment that accounted for either present or historical pay disparities.  In March and April 2021, a subset of women full professors were notified that they would be given a one-time salary bump.  Some of the pay adjustments were as low as $1,000, which did not come close to addressing the demonstrated pay shortfalls.  The majority of women received no pay adjustment at all.  Moreover, Vassar relied heavily on data and processes—namely the promotion and merit systems—that are well-understood to also be tainted with discrimination, to reach these half-measures of pay adjustments.

33.     Throughout this effort, Vassar also falsely asserted that any pay gap is the result of the fact that men are simply higher performers or simply better at leveraging offers to negotiate higher salaries.  In other words, Vassar's response to a group of their distinguished senior faculty raising concerns of gender pay inequity boiled down to:  men make more money because men are better or, if not, Vassar has decided it is acceptable to pay men more for the same job.  In reality, when women did attempt to negotiate their salaries, they were either actively discouraged from doing so or lied to about the possibility of negotiation.  For example, Professor Zeifman was told on at least two occasions—at hire and upon being awarded a Deanship—that her salary was completely non-negotiable, only to later learn that men had been permitted to negotiate their salaries in both circumstances.  When Professor Höhn—who had an offer from the University of Southern California with a higher salary than Vassar's, and had

already taught a year at the University of Pennsylvania—tried to negotiate her starting salary at Vassar, she was told by the then Dean of the Faculty that Vassar never negotiates starting salary.

34.    In recent years, Vassar has fallen even farther behind its equity mission—moving to *decrease* transparency around faculty salaries, despite widespread calls to *increase* transparency for the sake of identifying and redressing discrimination.  Vassar no longer shares reports with faculty that include mean and median salaries at each professorial rank, when reporting yearly salary raises.

35.    Vassar's refusal to correct known pay disparities is out of step not only with the College's purported history of advancing gender equality, but also with the widespread recognition by current faculty that Vassar has a pay equity problem.  Indeed, following the filing of this lawsuit, a group of 29 male full professors at Vassar wrote to "voice strong support" for Plaintiffs "in their class-action lawsuit against the College due to long-standing, gender-based discrimination in salary."[6]  These men "call[ed] upon President Bradley and the Vassar College Board of Trustees to settle the case amicably and promptly by agreeing to full compensation for the resulting financial inequities" and by committing "to address all forms of discrimination in the College's salary and compensation structure."[7]  Notably, 15 of the signatories to this letter are among the very individuals whom Vassar requested (over Plaintiffs' objection) that Plaintiffs publicly name in an amended complaint because Vassar has paid them more than Plaintiffs for substantially similar work.

---

[6] Male Professors of Vassar College, *The Miscellany News* (Sept. 20, 2023), https://miscellanynews.org/2023/09/20/opinions/letter-to-the-editor-male-professors/.
[7] *Id*.

## II.     Vassar Systematically Delays Promotion of Female Faculty

36.     Vassar has attempted to justify its underpayment of women by claiming that the reason male faculty have higher salaries than female faculty is that men are promoted to full professor earlier in their careers.  Vassar ignores two critical facts:  the College is responsible for this discriminatory promotion delay; and when it comes to equal pay under New York law, job title is not dispositive.  Instead, the key question is whether comparable individuals are performing substantially similar work, regardless of title.

37.     At Vassar, the promotion process is identical for all individuals, regardless of Department.  Faculty hired at the level of assistant professor follow the same path through the College: (1) an extension of contract review in their second year; (2) a review for reappointment to a second term as assistant professor in their fourth year; (3) a review for promotion to associate professor (i.e., a tenure review) in their seventh year; and (4) eligibility for promotion to full professor after six years as an associate professor.  The criteria for each of these promotions is exactly the same for all individuals, regardless of Department.[8]

38.     The groups involved at each promotion are likewise the same across the College. The extension of contract review involves only the Department, the Dean of the Faculty, and the President, and on occasion, the Faculty Appointment & Salary Committee (FASC).  The reappointment review involves the Department, the Dean of the Faculty, the President, and FASC.  The tenure review, which includes promotion from assistant professor to the rank of associate professor, includes the tenured members of the Department, the Dean of the Faculty,

---

[8] *See* Vassar College, *Faculty Handbook*, 2023-24, § 3.3.1 (setting forth the criteria for the contract extension), § 3.3.2 (setting forth the criteria for reappointment), § 3.3.3 (setting forth the criteria for promotion to associate professor), § 3.3.4 (setting forth the criteria for promotion to full professor), available at https://offices.vassar.edu/dean-of-the-faculty/wp-content/uploads/sites/36/Faculty-Handbook.pdf.

2928557.3

the President, FASC, as well as outside experts in the candidate's field of expertise who assess the candidate's scholarly contributions and standing in their field. After promotion to the rank of associate professor with indeterminate tenure, a faculty member is typically reviewed every three years by the Department, FASC, the Dean of the Faculty, and the President. Generally, after six years at the rank of associate professor, a faculty member is eligible to be reviewed for a promotion to full professor. The promotion to full professor review is conducted by full professors in the Department, FASC, the Dean of the Faculty, the President, and outside experts in the candidate's field of expertise who assess the candidate's scholarly contributions and standing in their field.

39.     Though this process is the same for all faculty, and neutral on its face, it has a disparate impact on women. Advancement to full professor requires department support and peer reviews that fundamentally favor men over comparable women and ensure that women take longer to advance. Female professors who nonetheless persevere and attempt promotion to full professor are often initially denied promotion (sometimes more than once) or met with strenuous and undue resistance by their Departmental colleagues. The delayed timeframe in which women advance through the academic ranks at Vassar is therefore nothing other than further evidence of discrimination at the College. In fact, Vassar has long known that its promotion process favors men. For example, in the survey of Vassar faculty reported out at the May 2011 Dean's retreat, of the respondents who answered "disagree strongly" to the prompt "criteria for advancement and promotion are clear," 73.3% were women while only 26.7% were men.

40.     Importantly, the promotion discrimination women face at Vassar cannot be explained by differences in their job duties or performance. At Vassar, faculty at comparable seniority within the College perform substantially similar work. Indeed, *all* "[t]enured faculty

members are expected to engage in teaching, scholarship and service in the Vassar community," and reviewers "shall consider all three areas of performance" while conducting post-tenure review.[9] Moreover, *all* tenured professors have the same job requirements, regardless of whether they perform this work at the full or associate professor level: "The official college-wide course load is the equivalent of six units of instruction a year; however, this has been reduced to a standard load of five courses per year, with the sixth course off in compensation for the normal expectation of supervision of theses, independent work, community-engaged learning, participation in programs, and participation in departmental and college committees."[10] Associate and full professors across the College therefore perform the same job duties. Further, and significantly, at Vassar there is no salary increase associated with the promotion to full professor.

41.     Accordingly, Vassar cannot pay women less than men simply because it also delays women in receiving the full professor title they have earned.

### III.     Vassar Unfairly Evaluates Female Faculty

42.     Vassar's merit system has systematically disadvantaged women and continues to systematically disadvantage women because it is tainted with bias. Vassar has been aware, based on its own internal data analysis, that women are given lower merit ratings at all professorial ranks. Despite this knowledge, the College refuses to revise the merit system or uncouple merit ratings from salary increases.

43.     At each of the reviews detailed above, the faculty candidate is evaluated on the basis of various materials, some of which are submitted by the candidate and some which are

---

[9] *Id*. § 3.3.5.

[10] *Id*. § 2.1.5.

supplied by the College.  These documents typically include a personal statement, curriculum vitae, annual activity reports, student course evaluation questionnaires ("CEQs"), and the most recent past review letter.  FASC also receives a "salary card" for the faculty member, which lists years of service, titles, years in current rank, and previous merit ratings.  Tenure reviews and promotion to full professor include these materials as well as a teaching portfolio, all scholarly or artistic activity undertaken during the years covering the review, a separate research statement, and recommendations from four outside evaluators.

44.    Reviews in which FASC, the Dean, and the President participate (i.e., extension for reappointment, tenure review, promotion to full, and all post-tenure reviews) culminate with the candidate being assigned a merit rating.  Annual faculty salary increases typically include a percentage base raise, which is a percentage of each individual faculty member's salary, and a merit raise.  The merit raise is a dollar amount linked to the candidate's merit rating on a four-point scale: distinction (worth 3 points), high merit (worth 2 points), merit (worth 1 point), or base salary/no merit (worth no points).

45.    At all academic ranks, Vassar women professors are awarded lower merit designations than men despite comparable or superior performance.  For example, courses taught by women have comparable or higher student enrollments, women have brought in the largest external grants, and women serve on uncompensated faculty committees in greater numbers proportionally than men—yet women systematically receive lower merit rankings.  A substantial body of scientific research confirms this discrimination is endemic in academia.[11]  The salary

---

[11] *See, e.g.,* Anne Boring, Kellie Ottoboni & Philip B. Stark, *Student Evaluations of Teaching (Mostly) Do Not Measure Teaching Effectiveness,* SCIENCEOPEN RESEARCH Vol. 0(0):1-11 (2016); Philip B. Stark & Richard Freishtat, *An Evaluation of Course Evaluations,* SCIENCEOPEN RESEARCH. Vol. 0(0):1-7 (2014); Burns-Glover, A. L., & Veith, D. J, *Revisiting Gender and*

cards, for example, perpetuate gender discrepancies by entrenching previous tainted merit designations and deficient salary recommendations.

46. Vassar has long been aware of the disparate impact its merit rating system has on women. Figures on full professors' merit ratings recently provided by Biniam Tesfamariam, of Vassar's Office of Institutional Research, reflect Vassar's awareness of a gender disparity in merit ratings. According to this data, men receive higher average merit ratings (2.41) than women (2.24):



47. Despite the longstanding and clear evidence that Vassar's merit rating system is biased against women, Vassar continues to rely on merit ratings to make compensation and promotion decisions.

## IV. Plaintiffs' Representative Experiences

48. **Plaintiff Wendy Graham** is a Professor of English. She earned her undergraduate degree from the University of California, Berkeley in 1979, her Masters from

---

*Teaching Evaluations: Sex Still Makes a Difference*, JOURNAL OF SOCIAL BEHAVIOR & PERSONALITY, 10(6), 69-80 (1995).

Columbia University in 1980, and her Ph.D. from Columbia University in 1989. She began her employment at Vassar in 1988 as a visiting assistant professor, was put on tenure track in 1990, was tenured in 1997, and was promoted to full professor in 2011. She has served as Chair of the English Department since 2019, having been voted to a second term that ends in 2025. Prior to that, she served as Associate Chair of English from 2014-18, and Associate Co-Chair of English from 2010-14.

49.     Professor Graham's areas of teaching and research are American and British literature, literary theory, gender, and culture studies. She has authored two books: *Critics, Coteries, and Pre-Raphaelite Celebrity* (Columbia University Press, 2017), and *Henry James's Thwarted Love* (Stanford University Press, 1999).

50.     Despite her distinguished record, Vassar has over the years compensated all of the following men more than Professor Graham for substantially similar work, in violation of the law: Mark C. Amodio, Robert K. Brigham, Andrew Davison, Marc Michael Epstein, Donald W. Foster, Christopher John Grabowski, Kevin S. Holloway, Paul Kane, Amitava Kumar, John Howard Long, Bert Lott, Brian Lukacher, John F. Meehan, Himadeep Muppidi, Joseph Nevins, Thomas Gregory Porcello, Ismail Rashid, Stephen R. Rock, Dan Ungurianu, Bryan W. Van Norden, and Jeffrey R. Walker. Beginning as early as 2012, Professor Graham requested a salary equity study to address her pay gap. Vassar refused to adjust her salary then, and to date, Vassar continues to underpay Professor Graham relative to her male peers.

51.     Professor Graham was directly harmed by Vassar's discriminatory promotion and performance evaluation systems. When she became eligible for promotion to full professor, it was clear to Professor Graham that she did not have the support within her Department necessary to be successful in the process—support that was readily provided to her male colleagues. At

every turn, Vassar actively discouraged Professor Graham.  For example, in 1997 Vassar told Professor Graham that the manuscript for her first book was unlikely to be published.  Not two months later, the book was accepted for publication *without revision* by the Stanford University Press.  Throughout her tenure, Vassar also wrongly suggested that Professor Graham's parenting responsibilities—and specifically her commuting hours—would frustrate her promotion; this, while Vassar permitted her male colleagues to regularly commute longer hours without comment.  For years, Professor Graham also witnessed Vassar's discriminatory promotion process disadvantage other women—time and time again, eligible women (like herself) were passed up for promotion, while less qualified men advanced.

52.     As a result of Vassar's discriminatory promotion process, Professor Graham's promotion to full professor was delayed in comparison to her male colleagues.  Despite being eligible for promotion to full professor as early as 2003, Professor Graham was not promoted to full professor until 2011—an eight-year delay.  Over the course of this eight-year delay, at least 20 men who started either with or after Professor Graham were promoted to full professor before she was.  For example, though they both joined Vassar in 1988, Mark Amodio was promoted *nine years before* Professor Graham.  And none of the 18 men who joined Vassar after Professor Graham, but were promoted before Professor Graham, had to wait the 14 years after tenure that she did to be promoted to full professor:  14 were promoted within six years, one within seven, and three between eight and ten.  Moreover, Vassar's significant delay in promoting Professor Graham stands in stark contrast to her male colleagues in the English Department, five of whom were promoted at or before eligibility, and one of whom was promoted within seven years.

53.     Throughout her tenure at Vassar, Professor Graham has also been unfairly evaluated relative to her male peers.  Despite being highly regarded for her scholarly work, she

received a "distinction" rating only in the years in which she published a book; otherwise she received the lesser "merit" or "high merit" ratings, or was not rated at all.  For example, in the same year Professor Graham was evaluated for promotion to full professor, she received only a "merit" rating despite the fact that in the preceding three years she had published four peer-reviewed articles, none of which were on the same topic as the manuscript she was also in the process of completing, and despite the fact that during this period she was also serving as the editorial board for the esteemed Henry James Review academic journal.  Professor Graham complained to Vassar about these unfair ratings on multiple occasions.  For example, Professor Graham complained twice in the late 1990s about Vassar's failure to fairly rate her work, despite her excellent publication record and positive CEQs (i.e., student evaluation scores).  Professor Graham complained again in 2010 when her review letters continued not to reflect either her significant scholarly contributions or her positive teaching record.  To date, Vassar has not corrected the problem.

54.     **Plaintiff Maria Höhn** is Professor Emerita of History on the Marion Musser Lloyd '32 Chair.  She earned her undergraduate degree from Millersville State University in 1991, and her Ph.D. from the University of Pennsylvania in 1995.  She began her employment at Vassar in 1996 after teaching one year as a lecturer at the University of Pennsylvania, was tenured in 2003, and was promoted to full professor in 2010.  In 2008, the Dean of the Faculty appointed Professor Höhn for a three-year term as Director of Faculty Research Development.  In 2011, then-President Cappy Hill appointed Professor Höhn for a three-year term to establish and direct the Andrew W. Mellon-funded Vassar-West Point Civilian Military Initiative.  From 2015-18, she served as Chair of the Department of History.  In 2016, the Dean of the Faculty and

the President appointed her to direct the 5 College-Consortium on Forced Migration and

Displacement supported by a $2.5 million Andrew W. Mellon Grant that she secured.

55.    Professor Höhn's area of research and teaching is history.  She is the author, co-

author, and editor of: *GIs and Fräuleins* (University of North Carolina Press, 2002), *A Breath of*

*Freedom: The Civil Rights Struggle, African American GIs, and Germany* (Palgrave Macmillan,

2010), *Over There: Living with the U.S. Military Empire from World War Two to the Present*

(Duke University Press, 2010), *In the Twilight of Empire: Count Alois Lexa von Aehrenthal*

*(1854-1912); From Foreign Minister in Waiting to de facto Chancellor* (Vandehoeck &

Ruprecht Verlage, 2020), and *Migration, Displacement, and Higher Education: Now What?*

(Palgrave Macmillan, 2023).  Her scholarship has been translated into German, Korean, and

Chinese, and has been adapted for both television and film.

56.    Despite her distinguished record, Vassar has over the years compensated all of the

following men more than Professor Höhn for substantially similar work, in violation of the law:

Robert K. Brigham, Andrew Davison, and John F. Meehan.

57.    Professor Höhn was directly harmed by Vassar's discriminatory promotion and

performance evaluation systems.  When she became eligible for promotion to full professor, it

was clear to Professor Höhn that she did not have the support within her Department necessary to

be successful in the process—support that was readily provided to her male colleagues, who

were readily encouraged to advance through the ranks at Vassar.  As a result, Professor Höhn's

promotion to full professor was delayed in comparison to her male colleagues.  Both of the men

who joined Vassar in the same year as Professor Höhn were promoted before she was; for

example, though they both joined Vassar in 1996, Andrew Davison was promoted three years

before Professor Höhn.  When Professor Höhn was promoted in 2010, she was promoted

alongside three men—all three of whom had fewer years of experience at Vassar than Professor Höhn.

58.     This discrimination cannot be explained by Professor Höhn's academic record—which is excellent—or performance reviews—in which she consistently received the highest merit rating of "distinction."  Rather, Professor Höhn was delayed by a system that fundamentally favors men over comparable women and ensures that women take longer to advance.  Moreover, in order to receive "distinction," Professor Höhn was required to substantially *outperform* her male colleagues—in teaching, scholarship and service—all to receive the same rating, and only to be paid less for her outsized efforts.

59.     **Plaintiff Mia Mask** is a Professor of Film.  She earned her undergraduate degree from Tufts University in 1991, and her Ph.D. from New York University in 2001.  She began her employment at Vassar in 2000, was tenured in 2007, and was promoted to full professor in 2016.  She is the Mary Riepma Ross '32 Chair, has served as Chair of the Film Department, and recently completed a three-year term as Vassar's Faculty Policy and Conference Committee Chair.

60.     Professor Mask's areas of research and teaching include African American cinema, documentary history, feminist film theory, African national cinemas, and genre films.  She is the author of *Divas on Screen: Black Women in American Film* (University of Illinois Press, 2009), editor of *Contemporary Black American Cinema* (Routledge, 2012), editor of *Poitier Revisited: Reconsidering a Black Icon in the Obama Age* (Bloomsbury, 2014), and sole author of *Black Rodeo: A History of the African American Western* (University of Illinois Press, 2023).  Her commentary and interviews have been on Turkish public broadcast TRT World,

-21-

National Public Radio programs "Tell Me More," "Marketplace," and "Morning Edition," and in documentaries for the Smithsonian Channel, the Criterion Channel, and CNN's *The Movies*.

61.     Despite her distinguished record, Vassar has over the years compensated all of the following men more than Professor Mask for substantially similar work, in violation of the law: Kevin S. Holloway, Leonard Nevarez, John F. Meehan, Himadeep Muppidi, Joseph Nevins, Thomas Gregory Porcello, Ismail Rashid, and Dan Ungurianu.

62.     Professor Mask was directly harmed by Vassar's discriminatory promotion and performance evaluation systems.  When she became eligible for promotion to full professor, Professor Mask was discouraged from applying, primarily because of a recent maternity leave, which she was led to believe would harm her chances of promotion.  As a result, Professor Mask's promotion to full professor was delayed in comparison to her male colleagues, who were expressly encouraged to apply.  For example, only one other man—Himadeep Muppidi—joined Vassar in the same year as Professor Mask, but Professor Muppidi was promoted four years before Professor Mask.  At least seven men who started after Professor Mask were promoted to full professor before she was, and none had to wait the nine years after tenure that Professor Mask did for the promotion:  six were promoted within six years, and one within seven.  And when Professor Mask was finally promoted in 2016, she was promoted alongside two men who had fewer years of experience at Vassar—one who started two years after Professor Mask and another who started seven years after Professor Mask.

63.     This discrimination cannot be explained by Professor Mask's excellent publication record, service record, or performance reviews, as she has consistently received the highest merit rating of "distinction" for well over a decade.  Rather, Professor Mask was delayed because Vassar's promotion system fundamentally favors men over women and ensures that

women take longer to advance. Moreover, in order to receive "distinction," Professor Mask was required to substantially *outperform* her male colleagues—in teaching, scholarship and service—all to receive the same rating, and only to be paid less for her outsized efforts. Additionally, early in her career Professor Mask received unfair merit ratings that were rooted in CEQs (i.e., student evaluation scores), which are well understood to disparately impact women. The discriminatory effects of these early, unfair merit ratings have persisted—and compounded—over time.

64.     **Plaintiff Cindy Schwarz** is a Professor of Physics. She earned her undergraduate degree from Binghamton University in 1980, her Masters from Yale University in 1983, and her Ph.D. from Yale University in 1985. She began her employment at Vassar in 1985, was tenured in 1992, and was promoted to full professor in 2006. She has served as Department Chair three times, in 1999-2001, 2005-2008, and 2011-2014. She was the recipient of a prestigious national teaching award in 2017—The David Halliday and Robert Resnick Award for Excellence in Undergraduate Physics Teaching. She is also a fellow of the American Association of Physics Teachers (AAPT).

65.     Professor Schwarz's area of teaching and research is physics. She has authored many papers (including 14 in peer-reviewed journals) and four books (several of which have been published in second and third editions)—*A Tour of the Subatomic Zoo: A Guide to Particle Physics* (American Institute of Physics, 1992; Springer, 1996; Morgan & Claypool Publishers and IOP, 2016), *Tales from the Subatomic Zoo* (Small World Books, 2002), *Interactive Physics Player Workbook* (Prentice Hall, 1995, 2004), and *Adventures in Atomville: The Macroscope* (Small World Books, 2009).

2928557.3

66.     Despite her distinguished record, Vassar has over the years compensated all of the following men more than Professor Schwarz for substantially similar work, in violation of the law:  Mark C. Amodio, Robert K. Brigham, Andrew K. Bush, Donald W. Foster, Brian J. Godfrey, Paul Kane, John Howard Long, Brian Lukacher, John F. Meehan, Stephen R. Rock, and Paul Russell.  Beginning as early as 2008, Professor Schwarz repeatedly requested an equity review to correct these disparities, but her requests were either ignored or declined  by the Vassar administration.  On at least one occasion, Professor Schwarz was told by Vassar that her request for an equity review had "slipped through the cracks."

67.     Professor Schwarz was directly harmed by Vassar's discriminatory promotion and performance evaluation systems.  Despite being eligible for promotion to full professor as early as 1998, she was not promoted to full professor until 2006—an eight-year delay.  Over the course of this eight-year promotion delay, Professor Schwarz was unfairly denied promotion three times while numerous male professors were promoted despite having shorter tenure and comparable (or lesser) records.  Indeed, at least 11 men who started either with or after Professor Schwarz were promoted to full professor before she was, and none of them had to wait anything close to the 14 years after tenure that Professor Schwarz did for the promotion:  eight were promoted within six years, two within seven, and one within eight.  For example, Professor John Long joined Vassar six years *after* Professor Schwarz, but was promoted two years *before* Professor Schwarz, after serving as an Associate professor for only the requisite six years. Professor Schwarz, in comparison, was not promoted for 14 years after tenure despite her consistently excellent letters and strong publication record.

68.     Throughout her tenure at Vassar, Professor Schwarz has also been unfairly evaluated relative to her male peers.  She never received a "distinction" rating, received a "high

-24-

merit" rating only three times, and received "merit" at every other review. These reviews have never faulted Professor Schwarz's excellent academic record, but instead focused on Professor Schwarz's CEQs (i.e., student evaluation scores). Vassar relied on these scores to unfairly rate and unfairly compensate Professor Schwarz despite widespread recognition, scientific research, and repeated reminders from Professor Schwarz herself that such scores disparately impact women. For example, Professor Schwarz complained about precisely this issue in connection with her denial of promotion in 2003; in a written response to that complaint, Vassar acknowledged Professor Schwarz's "concerns about gender bias," and stated that while the College "would like to see more research into the gender bias issue" there was a "ban on this research at Vassar." Vassar did not correct the issue then, and has not corrected it to date.

69. **Plaintiff Debra Zeifman** is a Professor of Psychological Science. She earned her undergraduate degree from Cornell University in 1988, Masters from Cornell University in 1993, and Ph.D. from Cornell University in 1996. She began her employment at Vassar in 1996, was tenured in 2003, and was promoted to full professor in 2013. From 2010-2011 Professor Zeifman was a visiting professor at Haverford College. Professor Zeifman served as Dean of Studies from 2019-2021, a position in which she was responsible for implementing the college's curriculum and educational policies, overseeing academic advising, and carrying out faculty legislation affecting the fulfillment of academic requirements for the degree. Prior to her appointment as Dean of Studies, Professor Zeifman served as Chair of Psychological Science (2014-2017), Director of Jewish Studies (2009-2010), and Chair of Vassar's Institutional Review Board (2006-2009). In addition, she has chaired and served on numerous faculty committees throughout her tenure at Vassar.

2928557.3

70.     Professor Zeifman teaches courses in developmental psychology, research methods, Holocaust studies, and evolutionary psychology.  She has authored 28 scholarly articles, including several widely cited peer-reviewed pieces and invited book chapters.  She is the first author on 21 of her 28 publications, presents regularly at national and international conferences, and is widely regarded as a leading expert in the field of infant communication, parent-child bonding, and attachment theory.

71.     Despite her distinguished record, Vassar has over the years compensated all of the following men more than Professor Zeifman for substantially similar work, in violation of the law:  Christopher B. Bjork, Robert K. Brigham, Andrew Davison, Christopher John Grabowski, Kevin S. Holloway, Bert Lott, John F. Meehan, Himadeep Muppidi, Leonard Nevarez, Joseph Nevins, Thomas Gregory Porcello, Ismail Rashid, Stephen M. Rooks, and Dan Ungurianu.

72.     Professor Zeifman was directly harmed by Vassar's discriminatory promotion and performance evaluation systems.  For years, Professor Zeifman witnessed Vassar's discriminatory promotion process disadvantage women, and was herself penalized for resisting that discrimination.  For example, before Professor Zeifman became eligible for promotion to full professor, she resisted Vassar's attempt to unfairly deny another woman tenure by writing a dissenting letter in support of this woman's promotion.  The woman was not promoted, and in response to speaking up in her favor, Professor Zeifman was rebuked.  Specifically, a senior faculty member—who would later become Chair of Professor Zeifman's Department—publicly berated Professor Zeifman for supporting this woman's promotion.  Years later, when Professor Zeifman approached the same colleague (by then Chair of the Department) about her promotion to full professor, he expressly discouraged her, citing an unpaid leave she had taken in connection with a pregnancy and repeatedly stating that her senior colleagues would "go after

her" if she attempted the promotion. Professor Zeifman persisted in seeking promotion, despite this discouragement and discrimination, and received a harsh departmental review and a nearly unanimous recommendation against promotion. Because Professor Zeifman's scholarship, service, and teaching records were unimpeachable, the review attempted instead to refute irrefutable facts. For example, it asserted that Professor Zeifman's excellent CEQs (i.e., student evaluation scores) must not have been the product of excellent teaching (they were), but of her failure to be sufficiently "rigorous" with students (she was), and asserted that the unanimous positive external reviews Professor Zeifman received from experts in her field must have been based on pre-tenure work (though they explicitly were not). Professor Zeifman was promoted to full professor only after she submitted a fulsome rebuttal of this review.

73.     As a result of Vassar's discriminatory promotion process, Professor Zeifman's promotion to full professor was delayed in comparison to her male colleagues. Both men who joined Vassar in the same year as Professor Zeifman were promoted to full professor well before she was promoted. For example, though they both joined Vassar in 1996, Andrew Davison was promoted six years before Professor Zeifman. At least ten men who started after Professor Zeifman were promoted to full professor before she was, and none had to wait the ten years after tenure that Professor Zeifman did for the promotion: eight were promoted within six years, and two within seven. For example, though Kevin Holloway joined Vassar *three years after* Professor Zeifman, he was promoted *three years before* Professor Zeifman.

74.     This discrimination cannot be explained by Professor Zeifman's excellent publication record, service record, or performance reviews, as she has consistently received the highest merit rating of "distinction" or the next highest rating of "high merit" since being promoted to full professor. Rather, Professor Zeifman was delayed by a system that

fundamentally favors men over comparable women and ensures that women take longer to advance. Moreover, in order to receive these ratings, Professor Zeifman was required to substantially *outperform* her male colleagues—in teaching, scholarship and service—all to receive the same rating, and only to be paid less for her outsized efforts.

75.     Vassar's actions have caused Plaintiffs and the Class substantial losses in earnings and other employment benefits. In addition, Plaintiffs and the Class suffered and continue to suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

## V.     Class Action Allegations

76.     Plaintiffs bring the following Causes of Action pursuant to Federal Rule of Civil Procedure 23 on behalf of all women currently or formerly employed by Vassar as full professors between May 14, 2015 through the resolution of this action (the "Class Period"). All said persons, including Plaintiffs, are referred to herein as the Class.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Although Plaintiffs do not know the precise number of Class members, the number is greater than can be feasibly addressed through joinder.

78.     There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members. Common questions include, among others:

        a.     whether Vassar pays women less than men for substantially similar work;

        b.     whether Vassar has knowingly maintained unlawful pay disparities between women and men;

        c.     whether Vassar's uniform compensation, promotion, and evaluation policies and practices have a disparate impact on women;

      d.        whether Vassar maintained uniform compensation, promotion, and evaluation policies and practices despite knowledge of their disparate impact on women;

      e.        whether Vassar's conduct, policies, and practices violate Title VII, the NY EPL, and/or the NY HRL; and

      f.        whether compensatory damages, equitable remedies, and punitive damages for the Class are warranted.

79.     Plaintiffs' claims are typical of the claims of the Class.

80.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions and employment discrimination litigation, in particular.

81.     Class certification is appropriate because common questions of fact and law predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class has been damaged and is entitled to recovery as a result of Vassar's common, uniform, unfair, and discriminatory policies and practices. Vassar has computerized personnel data that will make calculation of damages for specific Class members straightforward. The propriety and amount of punitive damages are based on Vassar's conduct, making these issues also common to the Class.

## FIRST CAUSE OF ACTION
### Intentional Discrimination in Violation of Title VII
### 42 U.S.C. §§ 2000e *et seq.*
### (On Behalf of Plaintiffs and the Class)

82.     Plaintiffs hereby re-allege and incorporate by reference all allegations in every preceding paragraph as if fully set forth herein.

2928557.3

83.     This claim is brought by Plaintiffs on behalf of themselves and the Class they seek to represent.  Plaintiffs received Notices of Right to Sue from the EEOC in connection with this claim, and have thus exhausted their administrative remedies.

84.     Vassar intentionally discriminated against Plaintiffs and the Class in violation of Title VII by, among other things:

      a.     intentionally, knowingly, and/or deliberately paying women less than men for substantially similar work;

      b.     implementing College-wide policies and practices that were unvalidated and discriminatory; and

      c.     intentionally, knowingly, and/or deliberately utilizing policies and practices that perpetuated and increased discrimination against female full professors.

85.     The foregoing conduct constitutes illegal, intentional discrimination prohibited by the Title VII.

86.     Plaintiffs request relief as hereinafter described.

**SECOND CAUSE OF ACTION**
**Disparate Impact Discrimination in Violation of Title VII**
**42 U.S.C. §§ 2000e *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

87.     Plaintiffs hereby re-allege and incorporate by reference all allegations in every preceding paragraph as if fully set forth herein.

88.     This claim is brought by Plaintiffs on behalf of themselves and the Class they seek to represent.  Plaintiffs received Notices of Right to Sue from the EEOC in connection with this claim, and have thus exhausted their administrative remedies.

2928557.3

89.     Vassar's reliance on unvalidated policies and practices to compensate, promote, and evaluate faculty members had an adverse impact on Plaintiffs and the Class.

90.     Vassar's use of these discriminatory policies and practices was and is not, and cannot be, justified by business necessity.

91.     Even if Vassar's discriminatory policies and practices could be justified by business necessity, less discriminatory alternatives exist and would have equally served any alleged necessity.

92.     The foregoing conduct constitutes illegal discrimination prohibited by Title VII.

93.     Plaintiffs request relief as hereinafter described.

### THIRD CAUSE OF ACTION
### Violation of the New York Equal Pay Law
### New York Labor Law § 194
### (On Behalf of Plaintiffs and the Class)

94.     Plaintiffs hereby re-allege and incorporate by reference all allegations in every preceding paragraph as if fully set forth herein.

95.     Throughout the Class Period, Vassar violated the NY EPL as to Plaintiffs and the Class by paying its female full professors at wage rates less than the wage rates it paid and pays to male professors for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

96.     Vassar's failure to pay women and men equal wages for performing substantially similar work is not justified by any lawful reason.

97.     Plaintiffs request relief as hereinafter described.

## FOURTH CAUSE OF ACTION
**Intentional Discrimination in Violation of the New York State Human Rights Law
New York Executive Law §§ 296-301
(On Behalf of Plaintiffs and the Class)**

98.     Plaintiffs hereby re-allege and incorporate by reference all allegations in every preceding paragraph as if fully set forth herein.

99.     Vassar intentionally discriminated against Plaintiffs and the Class in violation of NY HRL by, among other things:

  a. intentionally, knowingly, and/or deliberately paying women less than men for substantially similar work;

  b. implementing College-wide policies and practices that were unvalidated and discriminatory; and

  c. intentionally, knowingly, and/or deliberately utilizing policies and practices that perpetuated and increased discrimination against female full professors.

100.    The foregoing conduct constitutes illegal, intentional discrimination prohibited by the NY HRL.

101.    Plaintiffs request relief as hereinafter described.

## FIFTH CAUSE OF ACTION
**Disparate Impact Discrimination in Violation of the New York State Human Rights Law
New York Executive Law §§ 296-301
(On Behalf of Plaintiffs and the Class)**

102.    Plaintiffs hereby re-allege and incorporate by reference all allegations in every preceding paragraph as if fully set forth herein.

103.    Vassar's reliance on unvalidated policies and practices to compensate, promote, and evaluate faculty members had an adverse impact on Plaintiffs and the Class.

104. Vassar's use of these discriminatory policies and practices was and is not, and cannot be, justified by business necessity.

105. Even if Vassar's discriminatory policies and practices could be justified by business necessity, less discriminatory alternatives exist and would have equally served any alleged necessity.

106. The foregoing conduct constitutes illegal discrimination prohibited by the NY HRL.

107. Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

108. WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for the following relief:

a. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Designation of Plaintiffs as representatives of the Class;

c. Designation of Plaintiffs' counsel of record as Class Counsel;

d. All wages, including interest and benefits, due to Plaintiffs and Class Members in an amount to be ascertained at trial;

e. All other damages sustained as a result of Vassar's conduct, including damages for emotional distress, humiliation, embarrassment, and anguish, in an amount to be ascertained at trial;

f. Exemplary and punitive damages in an amount commensurate with Vassar's ability to pay and to deter future conduct;

g. Declaratory relief;

h.  Preliminary and permanent injunctive relief enjoining Vassar from violating Title VII, the NY EPL, and the NY HRL, by paying its female full professors lower wages than it pays their male counterparts for substantially similar work and from employing policies and practices that have a disparate impact on women;

i.  Reasonable attorneys' fees and costs to the extent allowable by law;

j.  Pre-judgment and post-judgment interest, as provided by law; and

k.  Such further relief that the Court may deem just and proper.

## **JURY DEMAND**

109.  Plaintiffs demand a trial by jury on all claims so triable.

Dated: January 30, 2024

Respectfully submitted,

By: /s/ *Kelly M. Dermody*

Kelly M. Dermody (*pro hac vice*)
Anne B. Shaver (*pro hac vice*)
Michelle A. Lamy (*pro hac vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

Rachel J. Geman
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500

Jessica R. Stender (*pro hac vice*)
EQUAL RIGHTS ADVOCATES
611 Mission Street, 4th Floor
San Francisco, CA 94105
Telephone: (415) 575-2394

*Attorneys for Plaintiffs and the
Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Kelly M. Dermody, an attorney of record in this matter, hereby affirm that the foregoing was filed on January 30, 2024 via ECF, which automatically served all counsel of record in this matter.

Dated: January 30, 2024      By: /s/ *Kelly M. Dermody* _____

                                Kelly M. Dermody

2928557.3